ANDREW E. PATTERSON, APPELLANT, vs. WILLIAM N. TAYLOR AND THEODORE RANDALL, APPELLEES.

1. Taylor mortgaged to Patterson certain·personal property, including a growing crop, to secure advances of goods, etc., to enable Taylor, a planter, to make and gather the crop. The mortgage debt not being paid, Patterson commenced suit to foreclose the mortgage, whereupon the mortgagor interposed a defence that the mortgaged property had been selected and set apart to him as "exempt from forced sale under any process of law:" *Held*, that the term "forced sale," as used in the Constitution, is a sale ·against the will of the owner, and not a sale to which he had expressly consented by giving the mortgage; that having thus, for a valuable consideration, given his consent to the alienation of the property, upon his breach of the condition of the mortgage, he is .estopped from revoking it; and the court, in ordering a sale, does but decree a specific performance of the agreement, which agreement was not forbidden by law.

2. An exemption of property from sale by process of law is a personal privilege, which may be waived by the owner of the property conveying an interest by means of an absolute or defeasible conveyance of property otherwise exempt from such sale.

3. A mortgagee of personal property does not release the property from the lien of his mortgage by his mere silence on being informed that a portion of the property has been disposed of by the mortgagor and delivered to another creditor. His assent to the delivery or other disposition of the mortgaged property might operate to release it so as to protect a third party.

4. An objection to the terms of a mortgage by the mortgagor, before signing, that it included property which he desired to reserve and use in paying a debt to another, cannot vary the legal effect of the mortgage.

5. A lessor of land, the lease being in writing, has no lien for rent upon the crops of the tenant under the provisions of "an act for the relief of landlords," (Chap. 1498, Laws of 1865–6,) until a warrant of distress is issued according to the provisions of that act.

Appeal from a decree of the Circuit Court of Madison county, Third Judicial Circuit.

In April, 1873, William N. Taylor, one of the appellees, executed to Andrew E. Patterson, appellant, a mortgage upon certain chattel property, to-wit: "one bay mule, one bay horse, and all of the corn and cotton that I may make the present year." The consideration was that Patterson had already loaned and advanced to him three hundred dollars, and the agreement by Patterson "to make further loans and advances to me in merchandise to the amount of twelve hundred dollars hereafter, until my crop is made, which said loans and advances are made and to be made for the purpose of enabling me to make, gather, gin, pack, and to deliver to him my cotton and corn crop," etc. The mortgage was duly recorded.

Appellant filed his bill in the Circuit Court of Madison county to foreclose this mortgage for the said advances. The bill alleges that Taylor was planting on the farm of Theodore Randall and complainant; before taking the mortgage or making advances he was informed that Randall had a claim against Taylor for rent of the land for 1873, to-wit:

that Randall was to receive twenty-one bales of the cotton first to be gathered, and being unwilling to make advances under the circumstances, he agreed with Randall that the cotton to be raised should be divided between them, each taking one bale alternately until the whole should be paid, and that nothing was said in this arrangement about the corn. The mortgage was then executed and delivered by Taylor, and advances made to him to the amount of twelve hundred dollars; that complainant had received nine bales of cotton and seventy-five bushels of corn, of the value of about six hundred dollars; that Taylor had delivered to Randall six hundred and seventy-five bushels of corn raised on the farm, Randall knowing of the mortgage and that it was unsatisfied; and that there is other cotton and corn in the hands of Taylor, and that he was disposing of it; that he has demanded the cotton and corn in the hands of Taylor, and the corn so delivered to Randall, but they refuse to comply. Randall claims that he is entitled to what has been delivered to him on account of rent and pursuant to a contract with Taylor. Taylor claims that the residue of the property mortgaged is exempted from liability to seizure and sale to satisfy the mortgage, notwithstanding the agreement contained in it that it should be held as such security and sold to satisfy the advances. The bill prays a foreclosure of the mortgage, and that the property be delivered up by Taylor and Randall to be sold, and that an injunction be granted to prevent a disposal of the property, and that a receiver be appointed, etc.

The answers of Taylor and Randall admit the execution of the mortgage for the consideration alleged and the advances by complainant, and Randall denies that he ever waived his right or lien on the crop for the rent, etc., except so far as to consent to a division of the cotton as alleged. Taylor says that when the mortgage was to be signed he objected to the mortgaging of the entire corn crop, on the ground that he had, in a written agreement with Randall,

agreed to return him six hundred bushels of corn which he had had from Randall, and if he signed the mortgage he could not comply with the agreement in the event that the cotton crop did not pay the rent and for the supplies, and that it was then agreed between him and Patterson that six hundred bushels of corn should not be considered as embraced in the mortgage, and with this understanding he signed the mortgage; that, pursuant to this understanding and agreement, he returned to Randall the six hundred bushels of corn, which fact was known to complainant and not objected to by him; that complainant, in an action at law against Taylor, levied an attachment upon the property of Taylor embraced in the mortgage, until which time defendants did not know that complainant claimed any interest in the corn that had been delivered to Randall.

Randall claims a special lien upon the crop and other property by virtue of a lease and agreement by which he leased to Taylor his plantation, the rent therefor to be twenty-one bags of cotton, and loaned to him his mules, etc., and six hundred bushels of corn for use on the place, the mules to be returned and the corn to be repaid by the return of six hundred bushels out of the crop of that year. (This lease is not recorded.) And Randall says that this agreement was well known to complainant when he took the mortgage and created a lien upon the property to that extent, which was recognized by complainant.

Taylor further answers that, when the property was attached, he applied to have the exemption allowed by the Constitution extended to him, and it was done, but the sheriff refuses to deliver the property to him. He claims that all the mortgaged property is exempt from forced sale under the foreclosure proceedings, and demands a decree to that effect, averring that he is the head of a family and residing in this State.

Complainant filed a general replication, and, upon proofs and pleadings, the court decreed that complainant had no

right at law or in equity to any of the property mortgaged, and that the bill be dismissed. The reasons for this decree appear in a written opinion of the Circuit Judge found in the record, and they are: 1. That the complainant had consented to the delivery of the corn to Randall, the landlord of Taylor, in accordance with an understanding between the parties at the time of the execution of the mortgage; and 2. That the property was exempt from forced sale to satisfy the mortgage debt, it being claimed as exempt by the defendant, Taylor, who could lawfully claim such exemption.

*Angus Patterson* for Appellant.

*Hunter Pope* for Appellees.

RANDALL, C. J., delivered the opinion of the court.

The complainant, Patterson, appeals from the decree in this case, and alleges that the court erred in adjudging that the defendant, Taylor, could claim, in this proceeding to foreclose a mortgage upon personal property, that the property is exempt and not liable to be sold under a decree, the mortgagor being the head of a family and residing in this State; the mortgage having been given to secure the mortgagee for advances made and to be made to enable the mortgagor to make his crop, which crop of corn and cotton were a part of the property mortgaged, the mortgage having been duly recorded; and in adjudging that the defendant, Randall, was entitled, notwithstanding the mortgage, to a large quantity of corn covered by the mortgage, which was delivered to him by the mortgagor in payment for certain corn loaned by him to the mortgagor and on account of rent of the plantation, the landlord having no lawful lien upon it by mortgage or otherwise.

These questions are presented upon this record:

Is it competent for the mortgagor of personal property to set up against a bill for foreclosure that the property mort-

gaged is exempt from sale to satisfy a debt secured by mortgage under the Constitution and laws of this State? The Constitution says that "one thousand dollars' worth of personal property * * * shall be exempted from forced sale under any process of law." Art. IX., Sec. 1.

There is no question that the owner of personal property may sell it for money, or to pay a debt, or dispose of his title to it in any other manner, provided the sale be not made under any "process of law." Having this right to control and dispose of his property, has he the power lawfully to subject it to sale, by any process of law, by consenting thereto? and, in such case, is such sale a "*forced* sale?"

In the Court of Appeals of New York, Mr. Justice Denio, delivering the opinion in Knettle vs. Newcomb, (22 N. Y., 249,) it is held that a promissory note, having annexed to it a stipulation "waiving and relinquishing all right of exemption of any property I may have from execution on this debt," is void, because it is against the policy of the law exempting property from sale on execution, which law is designed for the protection of poor men and their families against the consequences of over-confidence on the part of the debtor and over-reaching on the part of the creditor, and because it would in effect give to an execution a greater power than is given to it by the law, and thus control the effect of the process. This has been the almost universal current of the decisions of the courts in this country with reference to such contracts; yet, says the court in that case, "one may turn out his last cow on execution, or may release an equity of redemption, and he will be bound by the act."

In Texas the law, like ours, exempts certain property from "forced sale" upon process of law; and the courts of that State have uniformly held that a sale by virtue of any judgment or decree, founded upon a mortgage of the property, is a *forced* sale within the meaning of the exemption laws and of their constitution, and is therefore prohibited.

In California it is provided that the exemption from forced sale, on execution *or other final process*, "shall not extend to any mechanic's, laborer's, or other lien lawfully obtained, nor to any mortgage or other lien lawfully taken or acquired to secure the purchase money for said homestead." The term "forced sale" is used in the constitution as well as in the statute. The Supreme Court of that State, in Peterson vs. Hornblower, (33 Cal., 266,) says: "The several homestead acts were enacted to give effect to this provision. A 'forced sale' is not synonymous with a sale on execution. The latter may be, and often. is, voluntary in every respect. * * * Its quality, as being voluntary or forced, depends not on the mode of its execution, but upon the presence or absence of the consent of the owner. If those terms were synonymous, or were so understood by the Legislature, the provision would have been that the homestead shall not be subject to sale under execution .or other legal process. As the clause now stands, and with the interpretation contended for, no meaning or effect can be given to the word 'forced.' The meaning of a sale on execution or other final process is plain, and needs no interpretation; and the word 'forced,' unless it is to be rejected as insensible, must qualify the phrase with which it is connected. If it is rejected from the statute, it must have the same fate in the clause of the Constitution directing the enactment of the statute. But we think there can be no question that enforced sale means a sale against the will of the owner. It is apparent, upon reading the whole act in connection with the constitutional provision, that it was not the intent, either of the framers of the Constitution or of the Legislature, to prevent the owner or owners of the homestead property from voluntarily alienating, changing, or otherwise affecting it. The homestead was not forced upon him, but he was at liberty to avail himself of its protection or not at his election, and if accepted, to waive it at his election—the consent of his wife, if he was a married man, being required in

order to secure to her also the protection of the homestead exemption. * * It makes no difference, in respect to its being forced or voluntary, whether he consents directly to the sale or does the same indirectly by consenting to or doing those acts or things that necessarily or usually eventuate in a sale. A foreclosure sale, whether under a power of sale contained in the mortgage or in pursuance of a decree, is not a forced sale within the meaning of the Constitution or the statute." See also Chamberlain vs. Lyell, 3 Gibbs, Mich. R., 448.

The language of our Constitution, in respect to the exemption of real and personal property, is, that it "shall be exempted from forced sale under any process of law," but, in reference to real estate, it "shall not be alienable without the joint consent of husband and wife, when that relation exists." Of course this condition, the consent of the wife, is not required in the sale or other alienation of personal property.

It is held in Texas that any sale by means of the process of a court is a *forced* sale. The courts of that State agree that the exemption laws are designed to protect the man and his family in the enjoyment of the property necessary to their comfort, and against privation and poverty; and yet they hold that if a mortgage contains a power authorizing the mortgagee to sell and convey the homestead without the aid of the process of a court, it may be enforced and the law is satisfied. The prohibition, is that the mortgagee shall not have the aid of a court to enforce the contract. This is according to the letter of the law as they construe it, and the result is that the humane provisions of their exemption laws are rendered null by the simple device of foreclosing a mortgage by means of a power of sale contained in the mortgage.

There is nothing in our Constitution to prohibit the Legislature from changing the law relating to foreclosing mortgages hereafter executed, so as to authorize the mortgagee,

upon default of payment, to sell the mortgaged property, real or personal, at public or private sale, and to execute a deed or bill of sale and deliver possession, without the protecting vigilance of the courts, and thus render nugatory, as in Texas, all the protection of the exemption laws, even if we should hold to the same construction given to them by the courts of that State.

If the framers of the Constitution had designed to prohibit all judicial sales, even by the consent and procurement of the owners, it would have been a very easy thing to have so declared, as was done in a neighboring State.

In the Constitution of Georgia it is provided that each head of a family "shall be entitled to a homestead of realty to the value of two thousand dollars in specie, and personal property to the value of one thousand dollars in specie, both to be valued at the time they are set apart; and no court or ministerial officer in this State shall ever have jurisdiction or authority to enforce any judgment, decree, or execution against said property so set apart," including improvements, except for taxes, for purchase money, &c.

This is sufficiently clear and explicit. In Florida it is provided that certain real and personal property "shall be exempted from forced sale under any process of law," and thus not prohibiting all sales, but only "forced sales," in this State. It is further provided that the real estate shall not be alienable without the joint consent of husband and wife, when that relation exists, and therefore this property may be alienable with the joint consent of husband and wife; and we may hence conclude that the words "forced sale" and alienable by "consent," are to be construed with reference to their bearing upon each other and upon the subject matter, and that the property may be "alienable" by any means known to the law if the consent be obtained, and if consent be obtained, it is not a forced or involuntary alienation.

If, again, the framers of the Constitution had intended to

Patterson v. Taylor and Randall.

prohibit the contingent alienation by means of a mortgage of any property, they would have used unequivocal language to express that intention, and thus placed beyond the reach of legislative control the power to encumber by mortgage, or to authorize a sale by virtue of a power to be inserted in a mortgage by the mortgagee at a public or private sale without the process of a court, as is done in Texas and in some other States.

That they did not so frame the prohibition implies that they did not intend to prohibit the mortgaging of any species of property, whereby an alienation of it might ensue, the consent being the only condition required in respect to the real estate to render it " alienable."

As to personal property, the same rule will prevail as to the effect of the term " forced sale," as in regard to real property.

All the courts are constrained to sustain the exemption laws upon grounds of public policy and humanity. These considerations doubtless controlled in the framing of our Constitution. If there ever existed a people requiring protection of this character at the time of the adoption of that instrument, that people inhabited these Southern States, just emerged from a long and destructive war. Nearly all were poor—many entirely destitute—and many having only the soil of their former flourishing plantations and homes, without money, without farming implements or stock, and all practically at the mercy of creditors, whose demands probably exceeded the then cash value of the productive lands in these States. Capital had gone elsewhere, and but for the means brought from afar to aid them, our planters were utterly helpless. Under the most favorable circumstances it must take long years for these people to recuperate and bring themselves up to a condition of comparative prosperity. Money and supplies, even food and clothing, must be had from abroad to enable them to live and cultivate their broad acres. The laboring classes were equally

destitute and dependent upon the making of crops. Means could be had to aid the people in their straits, but not without security to the lender and the merchant. Was it the intention of the law-makers to take from all these people the last resources, the power and the means of securing the creditor for the advances necessary to enable the people to preserve life itself? Did they intend to proclaim to the merchant that no safe security could be given for such advances, because the new law would not permit the enforcement of liens upon the property pledged to secure them? Did the public law permit that in whatever form a pledge might be made the borrower might, at any time, withdraw it and declare it a sham and a fraud? If this were the case, God save the people! The basis of private pecuniary credit is security and confidence, and it could not be expected that the merchant would advance his money and his property with no security and no means of reimbursement. And if the law-makers intended to deprive the people of the ordinary means of obtaining credit, they might have so declared in unmistakable terms. Then the people might have yielded to their fate of poverty and helplessness, and have gone, if they could find the means of going, to a more favored land; but if such was not the intention, then industry and enterprise could help itself out of poverty and wretchedness by the ordinary means of upright honorable business transactions, and so they did.

We do not believe it was the intention of the Constitution to deprive the citizens of the common rights and privileges pertaining to property and credit, so far as to render their condition abject and hopeless in their poverty, beyond its express provisions, and the evident intention must control our construction of its language without doing violence to it. Motives of public policy and humanity come to our aid in sustaining this conclusion. And there are considerations of policy and humanity in so construing the law as to enable all people to demand the specific execution of their

contracts when such contracts do not contravene the law. It is a humane provision that men and families, through misfortune, shall not be stripped of the little property necessary to their comfort and subsistence, and when one gives credit by lending money or selling goods without security, he does so in view of the laws exempting certain property from forced sale, and the creditor cannot complain, for he extends credit with full knowledge of the rights of the debtor and his family, relying alone upon his remedy at law. And where a borrower obtains a loan of money by a pledge and consent, legally given, that certain specified property shall stand as a security for the loan, he does so in view of the legal result that if the loan be not paid, the property which was pledged as the security, and without which the loan would not have been obtained, will be sold to pay the debt. The law providing the remedy is before the debtor when the pledge is given and enters into the contract, and cannot be changed so as to affect the contract. Both parties have assented to it, and the action of the court is but carrying out specifically what has been consented to ; so that the decree of the court, instead of effecting a *forced* sale, merely compels the parties to abide by their specific agreement, and the sale is decreed in pursuance of that contract. Having so consented, he is estopped from withdrawing the consent. Should it be decreed that he may do so and thus entrap the lender, policy and humanity might well cry out in behalf of the lender and in behalf of *his* wife and children, who are thus impoverished and brought to want.

We are of opinion that Taylor, having executed a mortgage in due form of law upon the crop of cotton and corn and the other personal property named, which he might lawfully do, and having received the stipulated consideration, cannot now select this property as exempt, and thus avoid and defeat his solemn covenant. To allow this in the present case would be certainly inequitable. Taylor, with-

out the means of cultivating the soil and making the crop, mortgages the growing grain to obtain the necessary supplies. He so obtains twelve hundred dollars and raises a crop, and after paying for the labor employed, saves perhaps a thousand, having in the meantime supported himself and family out of the supplies. Having then a thousand more than he commenced with, he takes refuge behind the exemption law, keeps the thousand dollars, and the benefactor "whistles down the wind." Public policy and humanity cannot sanction transactions of this character.

II. We proceed to examine the pleadings and evidence to ascertain whether the court erred, as alleged, in deciding that the complainant has no rights as against the defendant Randall to the corn delivered to him by Taylor in payment of so much corn borrowed of him by Taylor, and on account of Randall's claim for rent. If the corn was exempt from sale to satisfy the mortgage upon it, there would be no necessity of further inquiry; but as we do not find that it was exempt from the mortgage lien, we must dispose of the other branch of the case.

The facts, as understood from the record, are that Taylor was a tenant occupying the land of Randall for the year 1873; that Randall was to receive for the rent of the plantation twenty-one bags of cotton, to be delivered out of the first cotton ginned and packed; and Randall agreed to furnish to Taylor such farming utensils as he had, six mules and six hundred bushels of corn, and at the end of the year Taylor was to return the plantation, farming utensils and mules; also, as soon as the crop should be made, to return the six hundred bushels of corn and a certain amount of fodder. This agreement was in writing, but not recorded.

Patterson testifies that Randall first applied to him to know whether he would furnish Taylor with supplies to run the plantation. That Patterson refused, because Randall was to receive the first twenty-one bales of cotton. After-

wards Taylor and Randall came to P.'s store and again asked him if he would furnish supplies to Taylor, and he replied that he would if Randall would waive his right to the twenty-one bales and come in with him *pro rata*, (i. e., one bale to each alternately,) and he, P., should take a mortgage on Taylor's entire crop to secure him. Randall refused this. Afterwards Randall met him and agreed to the proposition—the amount of supplies agreed on to be $1,200, including some $300 which he had already furnished Taylor. In April Taylor gave P. a mortgage to secure him for advances and loans to the amount of $1,200, for the purpose of enabling Taylor to make the crop and deliver it; and by the terms of the mortgage Taylor sold to Patterson "one bay horse and one bay mule and all of the corn and cotton that I may make the present year." Taylor further covenanted to cultivate at least one hundred and seventy-five acres in cotton and one hundred and forty acres in corn—to gather, gin, pack and deliver the cotton to Patterson at his store on or before the first day of November, and to gather and house the corn and hold it subject to Patterson's order. That if sufficient corn and cotton should not be made to pay the advances, Taylor was to deliver the horse as well as the cotton and corn, provided, that if Taylor should pay the amount of loans and advances by the first of November, the instrument to be void. This mortgage was duly witnessed, proved and recorded April 22, 1873, in the county clerk's office. Patterson furnished Taylor to the amount of $1,200 in supplies, and received on account of it nine bales of cotton, seventy-five bushels of corn and eleven dollars and sixteen cents in cash and a quantity of cotton seed, and Taylor yet owes him six hundred and forty-one dollars, besides interest; never released any of the stock or crops from his mortgage. Randall knew he was to take the mortgage, and never objected to it. Patterson knew Randall had loaned Taylor six hundred bushels of corn, but never heard from either of them that the corn was to be

returned before he, P., was to be paid for his advances. Understood Randall was to have twenty-one bales of cotton for the use of the plantation and mules, and that the six hundred bushels of corn was to be returned in the fall. Understood from Randall that the cotton would be sufficient to pay them both. Nothing was said about Randall waiving his right to anything except the cotton, and only to the extent that each should receive one bale alternately, until witness was paid for his advances. At the time Taylor made the mortgage he did not say anything to witness, nor did witness hear anything said about the six hundred bushels of corn. Witness did not get more than the nine bales of cotton, because it was not ginned and packed. Witness heard Taylor had applied to have his property set apart under the homestead and exemption laws, and then sued out an attachment against him. There was no agreement that witness and Randall should divide the corn as they did the cotton. Randall asked witness if he was not going to divide the corn as they had done the cotton, and witness told him he would not; but, rather than have any trouble about it, he would divide everything raised on the place; but Randall refused to divide the six hundred bushels of corn. Did not agree that Randall should take seventy-five bushels of corn. Randall insisted that witness should authorize Taylor to deliver him as much corn as he got, but witness did not agree to it; but after the cotton was divided would see about the corn. Witness understood, at the time he was hauling some corn he had bought of Taylor, that Taylor had delivered six hundred bushels to Randall, and never raised any objection till he got out his attachment. All these conversations were within a short time before the attachment. Witness heard that Taylor had sold some corn, and this prompted him to get out the attachment.

R. M. Witherspoon testified that Patterson and Taylor both requested him to draw up the mortgage. When it was read to Taylor he remarked that he had borrowed six

hundred bushels of corn from Randall that he had to pay back. Witness told Taylor it was a mere matter of form—there would be plenty of cotton to pay the mortgage, and when the mortgage was read Taylor signed it. This was at Patterson's store. Thinks Patterson was not present when the remark was made. L. H. Patterson, a witness, was present when the mortgage was read, and witnessed it; did not hear Taylor say anything about the corn.

W. N. Taylor, sworn, says—When Witherspoon called him in to sign the mortgage complainant was present, and on reading the mortgage, witness told W. to stop; he had borrowed six hundred bushels of corn from Randall that had to be paid back out of that crop; that Patterson did not look at witness, nor make any reply; would not have signed the mortgage if he had known it would have deprived Randall of the corn. Witness turned over to Randall about six hundred bushels of the corn; did not notify Patterson that he had done this, as he did not think it necessary, but casually remarked one day, in a conversation with P., that he had turned it over to Randall, to which Patterson made no objection. Afterwards Randall wanted the corn delivered formally in the presence of witnessess, which witness did. Patterson was informed by witness about the contract with Randall before the mortgage was signed.

Theodore Randall, sworn—Informed Mr. Patterson of the terms of his contract long before the mortgage was executed. Witness has never waived his right to the six hundred bushels of corn. Stated to P. that he was willing Taylor should give him a mortgage on all the corn except the six hundred bushels. There was conversation afterwards about dividing the corn raised in excess of the six hundred bushels, and seventy-five bushels each were delivered to witness and Patterson. Witness never alluded to the six hundred bushels in telling Mr. P. that he thought he would be secure, if witness told him so. Patterson insisted that the six hundred

bushels should be divided between them in like manner as the cotton, but witness would not consent to it.

This is a brief synopsis of the testimony which is deemed to bear upon the controversy.

Randall, it seems, had a contract, embraced in the body of the lease, that six hundred bushels of corn should be furnished by him to Taylor, and that Taylor should return the like quantity out of the crop to be raised. The lease was not recorded, nor did Randall take any other security for the corn furnished.

Chapter 1498, Laws of 1865–6, entitled " an act for the relief of landlords," provides that on failure to pay rent under a written lease, the landlord may obtain a warrant of distress against the goods and chattels of the tenant, and *such writ* shall be a lien on all the crops grown on the land during the year. This applies to the rent only, not to supplies furnished.

Chapter 1739, Laws of 1870, provides that any person who shall procure a loan or advance of money or goods, to aid him in the business of planting, farming, etc., may give a lien *superior* to all other incumbrances, excepting for labor, provided the borrower shall give an instrument in writing consenting to such lien, which shall be recorded in the records of the Circuit Court of the county, etc. ; and all conflicting laws are repealed.

Mr. Randall, having failed to put on record any evidence of his lien, if he had a lien, had no right to take the corn or crop in satisfaction of his loan, as against the mortgagee, Mr. Patterson, whose mortgage was duly recorded and covered the whole crop. It can make no difference with the legal rights of the parties that there was an understanding at the time of the execution of the mortgage contrary to the effect of the instrument itself. There was a bare agreement between Randall and Taylor that the six hundred bushels of corn should be returned, and undoubtedly Patterson knew of it. The indebtedness of Taylor to Randall

had no greater dignity than his indebtedness to any other person which may have been intended to be paid out of the crop, or contracted to be paid out of the crop. Taylor had a right to give the mortgage and to create the lien, and, indeed, Patterson was urged by Randall, as well as by Taylor, to make the advances, the only stipulation as to dividing the crop being that which related to the cotton, which it seems was finally complied with, so far as there was any delivery of the cotton. Taylor, it is true, objected to signing the mortgage on account of his agreement with Randall, but finally did sign it, all parties believing, we presume, that the cotton would be sufficient to satisfy the rent and Patterson's advances also. Patterson swears that he was assured by Randall, before the advances and the mortgage, that he would be safe, because the cotton would be sufficient to pay them both. He says he knew that Randall had loaned Taylor the corn, but never heard from either of them that it was to be returned before he was to be paid for the advances.

Upon well settled principles, no agreement or understanding anterior to the making of the mortgage can vary the express terms of the contract. There is no ambiguity in the terms of the mortgage. Mr. Patterson, then, by the effect of the mortgage, had a lien upon and a lawful right to subject the entire mortgaged property to the payment of the indebtedness secured by the mortgage. Randall might have had his security, but failed to comply with the statute, and thus subordinated his claim to that of the more vigilant creditor. There is no fraud or mistake in the mortgage which authorizes the court to set it aside or vary its effect.

Did Patterson say, or do, or agree to anything, after his mortgage was obtained, which authorized the other parties to so dispose of the mortgaged property as to affect his lien upon it? We do not find that he did. He seems to have felt secure until it was found that the crop was not sufficient

to pay both debts. He expressly assented to a division of the cotton, so far as it was divided, but we find no express assent to releasing the corn. Finding that Randall had taken the six hundred bushels of corn, he denied Randall's right to it, yet offered to divide it as in case of the cotton, but Randall declined this offer; showing that Patterson did not intend to abandon his rights altogether, but that he was willing to share the loss, if any, with Randall. It is testified that Taylor "did not notify, but casually remarked one day in conversation with Patterson," that he (Taylor) had delivered the corn to Randall, and that Patterson did not make any objection. This was after the corn had been delivered to Randall, and it does not appear that at this time there would be any danger of loss; and this silence on the part of Patterson is far from being an authority for the delivery. Soon afterwards, finding that the crop was being otherwise sold and disposed of, Patterson set about securing himself. If it appeared that Patterson had, at any time after the execution of the mortgage, consented that Taylor might deliver any portion of the crop, as in the case of the division of the cotton, he would be bound by it so far as a delivery was made; but a mere offer to divide, not acquiesced in or accepted, is not binding upon him.

Upon the whole evidence, it does not appear that Patterson released any portion of the mortgaged property, unless it be in reference to the division of the cotton, and he is therefore entitled to the relief demanded by his bill.

The decree of the Circuit Court is reversed and set aside, and the cause remanded, with directions that further proceedings may be had in conformity with this opinion, and according to the law and equity of the case, and the practice of the court.